# CHARLESTON.

STATE *v.* PEEL SPLINT COAL CO.

Submitted June 20, 1892.—Decided October 6, 1892.

1. CONSTITUTIONAL LAW—"SCRIP" ACT—LABORERS' WAGES—"SCREENING" ACT—WEIGHING AND MEASURING COAL.

On the 7th day of March, 1891, the legislature passed an act prohibiting any corporation, company, firm or person engaged in any trade or business, either directly or indirectly, to issue,

sell, give or deliver to any person employed by such corporation, company, firm or person, in payment of wages due such laborer, or as advances for labor not due, any scrip, token, draft, check or other evidence of indebtedness payable or redeemable otherwise than in lawful money; and, if any such scrip, token, draft, check or other evidence of indebtedness be so issued, sold, given or delivered to such laborer, it shall be construed, taken and held in all courts and places to be a promise to pay the sum specified therein in lawful money by the corporation, company, firm or person issuing, selling, giving or delivering the same to the person named therein or to the holder thereof; and providing, further, that a violation of this section on the part of such corporation, *etc.*, shall be a misdemeanor punishable by fine and imprisonment. And on the 9th day of March, 1891, the legislature passed another act for weighing and measuring coal at the place where mined, before the same is screened, which provided that all coal mined and paid for by weight shall be weighed in the car in which it is removed from the mine, before it is screened, and shall be paid for according to the weight so ascertained, at such price per ton as may be agreed on by such owner or operator and the miners who mined the same; and coal mined and paid for by measure shall be paid for according to the number of bushels marked upon each car in which it is removed from the mine, and before it is screened, and the price paid for each bushel so ascertained shall be such as may be agreed on as aforesaid; and provided, further, that a violation of the act by any corporation, *etc.*, should be a misdemeanor punishable by fine and imprisonment. *Held*, that neither of these acts is in violation of the constitution of this State, nor that of the United States, but that both acts, when applied to the facts of this case, are within the scope of legislative authority.

2. CONSTRUCTION OF STATUTES.

The principles of constitutional and statutory construction laid down by this Court in *Osburn* v. *Stealey*, 5 W. Va. 85; *Slack* v. *Jacob*, 8 W. Va. 612; and *State* v. *Workman*, 35 W. Va. 367 (14 S. E. Rep. 9)—approved and reaffirmed.

3. INDICTMENT.

In this State the defendant can not be permitted to frame the indictment under which he is to be prosecuted for an alleged violation of law.

*Knight & Couch, Mollohan & McClintic* and *Brown, Jackson & Knight* for plaintiff in error¯ cited—Bill of Rights sec. 1; Id. sec. 10; 33 W. Va. 179; Id. 148; Id. 188; 98 N. Y. 114; Id. 106; 109 N. Y. 389; Id. 398; 113 Pa. St. 431; 117 Ill. 294; Id. 302; 85 Cal. 274; 28 N. E. Rep. No. 22; Const. (U. S.) Am. 14; 129 U. S. 26, 28; 118 U. S. 394; 125 U. S. 181; 117 N. Y. 20; Id. 1; Id. 15; 97 Ill.

608; 13 Fed. Rep. 744; 48 Mich. 140–147; 13 Gray 239; 81 Ky. 593; 1 Beach Corp. § 40; 56 Md. 79; Id. 240; Code (1891) c. 59, s. 17; 12 Mo. App. 214; 127 M. S. 678; 114 Pa. St. 265; 107 U. S. 38; 21 W. Va. 334; Cool. Const. Lim. 177–180; 2 Yerg. 554; 16 Pick. 121; 109 Mass. 315; 111 U. S. 746; 109 U. S. 23; 94 U. S. 113; 3 Ala. (N. S.) 140; 113 Pa. St. 431: 121 Ind. 366; 7 W. Va. 191; 21 W. Va. 534; 31 W. Va. 710; 95 U. S. 324.

*St. Clair & Gaines* for plaintiff in error cited 117 Ill. 294; Cool. Const. Lim. 481; 2 Yerg. 554; Const. Art. III, sec. 1; Const. (U. S.) Am. 14.

Attorney-General *Alfred Caldwell* for the State cited Broom Leg. Max. 1; 2 Kent. Com. 338; 4 Blacks. Com. 162; B. 2, ch. 6; 27 Vt. 149; 11 Pet. 102; 46 Me. 189; 113 U. S. 27, 31; 123 U. S. 623; Cool. Const. Lim. 221; 55 Md. 74, 80; 94 U. S. 113; Cool. Const. Lim. (6th Ed.) 744; Id. 725; 137 U. S. 624; Id. 80, 90, 91; 16 Wall. 36; 121 Ind. 366; 104 N. C. 714; 29 Am. & Eng. Corp. Cas. 517; 1 Wash. 156; 42 La. Ann. 1166; 49 Ark. 291; 25 W. Va. 1; 3 H. VIII ch. 9; 17 Neb. 140; 32 Minn. 324; The Rep. Vol. 23, p. 433; Id. Vol. 24, No. 8; Id, No. 16; 83 Mo. 123; Id. 421; 106 N. Y. 293; 108 Ind. 365; 102 Ind. 528; 81 Mo. 421; 60 Ia. 134; 132 Mass. 542; 67 Ind. 45; 2 McC. 495; 14 Wend. 87; 63 Ind. 552; 70 Ill. 191; 110 Ill. 590; Dill. Mun. Corp. (3d Ed.) § 141; Horr. & Ben. Mun. Pol. Ord. § 211; Pott. Dwar. Stat. & Con. ch. 14; 97 U. S. 25; 111 U. S. 746–751; 127 U. S. 678; 123 U. S. 663; 118 U. S. 356; 113 U. S. 27; Id. 703; 116 U. S. 252; 118 U. S. 455; 97 U. S. 25; Id. 501; 16 Wall. 36; 18 Wall. 129; 16 Wall. 130; 94 U. S. 113; 25 Gratt. 11; 101 Ind. 564; Cool. Const. Lim. (5th Ed.) 197; Id. 201; People *v.* West 106 N. Y.; 113 Pa. St. 431; 110 Ill. 590; 98 N. Y. 98; 99 N. Y. 377; 114 Pa. St. 265; Tiedm. Lim. Pol. Pow. §§ 89, 102, 140d., 178; 8 W. Va. 612.

*J. H. Ferguson* and *C. C. Watts*, assistant counsel for the State, cited 113 U. S. 27, 30–32; Id. 703, 708, 709; 129 U. S. 26; 94 U. S. 113; 35 & 36 V. ch. 76; 6 Ency. Brit. 71; 113 Pa. St. 431; 127 U. S. 678; Id. 210; 117 Ill. 294;

Const. Art. X. sec. 1; 97 Ill. 593; 27 Vt. 140; 64 N. H. 594; 2 Metc. (Ky.) 3; 44 Mich. 280; 8 Leigh. 514, 519; 16 Ohio 348, 354, 355; 2 Ohio St. 153; 14 Ency. Brit. 172, 173; 70 Ill. 191; Cool. Const. Lim. (2d Ed.) 572; 12 Mo. App. 214; 5 How. (U. S.) 583; 94 U. S. 125; 113 U. S. 27; 129 U. S. 26; 2 Rev. Code (1819) 134; Id. 185, 213, 214; Code (1849) c. 87, s. 3; 2 Rob. 241; Acts (Md.) 1880, c. 273; Acts (Ind.) 1887, c. 12; 121 Ind. 366.

LUCAS, PRESIDENT:

These cases come before us on judgments of the Circuit Court of Kanawha county pronounced in them in June, 1891, wherein the Peel Splint Coal Company was defendant, and the State of West Virginia was prosecutor, upon indictments under chapters 76 and 82 respectively of the Acts of the Legislature of 1891. Those acts are as follows:

· "An act in relation to the payment of laborer's wages in anything other than lawful money, and in relation to the rates of goods and supplies to laborers by their employers at excessive prices. (Passed March 7, 1891.)

"Be it enacted by the legislature of West Virginia:

"(1) It shall be unlawful for any corporation, company, firm, or person engaged in any trade or business, either directly or indirectly, to issue, sell, give, or deliver, to any person employed by such corporation, company, firm, or person, in payment of wages due such laborer, or as advances for labor not due, any scrip, token, draft, check, or other evidence of indebtedness, payable or redeemable otherwise than in lawful money; and, if any such scrip, token, draft, check, or other evidence of indebtedness, be so issued, sold, given, or delivered to such laborer, it shall be construed, taken, and held in all courts and places to be a promise to pay the sum specified therein in lawful money by the corporation, company, firm, or person issuing, selling, giving or delivering the same to the person named therein, or to the holder thereof. And the corporation, company, firm, or person so issuing, selling, giving, or delivering the same shall, moreover, be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty five dollars, nor more than one hundred

dollars, and, at the discretion of the court, the officer or agent of the corporation, company, or firm, or the person issuing, selling, giving, or delivering the same, may be imprisoned not less than ten, nor more than thirty, days.

"(2) If any corporation, company, firm, or person shall coerce or compel, or attempt to coerce or compel, an employe in its, their, or his employment, to purchase goods or supplies in payment of wages due him, or to become due him or otherwise, from any corporation, company, firm, or person, such first-named corporation, company, firm, or person shall be guilty of a misdemeanor, and upon conviction thereof shall be punished as provided in the preceding section. And if any such corporation, company, firm, or person shall, directly or indirectly, sell to any such employe, in payment of wages due or to become due him, or otherwise, goods or supplies at prices higher than the reasonable or current market value thereof at cash, such corporation, company, firm, or person shall be liable to such employe, in a civil action, in double the amount of the charges made and paid for such goods or supplies, in excess of the reasonable or correct value in cash thereof.

"(3) It shall be the duty of every court, having jurisdiction in criminal cases in which grand juries are empanneled to give this act in charge to the grand jury."

"An act providing for weighing and measuring coal at the place where mined, before the same is screened. (Passed March 9, 1891.)

"Be it enacted by the legislature of West Virginia:

"(1) It shall be the duty of every corporation, company, or person engaged in the business of mining and selling coal by weight or measure to procure and constantly keep on hand, at the proper place, the necessary scales and measures, and whatever else may be necessary, to correctly weigh and measure the coal as mined by such corporation, company, or person; and it shall be the duty of the sealer of weights and measures, for every county in which coal is so mined and sold, to visit each coal mine operated therein, and where such scales and measures are kept, at least once in each year, and test the correctness of such scales and measures. The owner or operator of such coal mine, or

any two or more of the miners working therein, may in writing require his attendance at the place where such scales and measures are kept at other times, in order to test the correctness thereof, and it shall be his duty to comply with such request as soon as he can after receiving such request. If his attendance is required by the owner or operator of such mine, or if by the miners working therein, and the scales or measures tested be found not to be correct, his fees shall be paid by the owner or operators; and if his attendance be required by the miners, and the scales or measures tested be found to be correct, his fees shall be paid by them. If in any such county there be no sealer of weights and measures, the duties herein required to be done and performed by such sealer shall be done and performed by the inspector of mines for the district of which such county forms a part.

"(2) Each car used by any such corporation, company, or person in removing coal from any coal mine shall be numbered by consecutive numbers, plainly marked, and placed and kept thereon as long as such car is so used; and if the coal from such mine is mined, and the miners are paid according to the weight thereof for mining the same, every such car so used shall be weighed upon such tested scales, and the weight thereof shall be plainly marked and placed thereon as long as such car shall be used as aforesaid. If the coal at any such mine is mined, and the miners thereof are paid for mining the same by measure, the number of bushels of coal such car will hold, when loaded to its capacity, shall also be plainly marked, and placed and kept thereon as long as such car is so used as aforesaid; and no car shall be used for the purpose aforesaid, after ninety days from the time this act takes effect, until the provisions of this section are complied with.

"(3) All coal so mined and paid for by weight shall be weighed in the car in which it is removed from the mine before it is screened, and shall be paid for according to the weight so ascertained, at such price per ton as may be agreed on by such owner or operator, and the miners who mined the same; and coal mined and paid for by measure shall be paid for according to the number of bushels

marked upon each car in which it is removed from the mine, and before it is screened, and the price paid for each bushel so ascertained shall be such as may be agreed on as aforesaid.

"(4) Every such corporation, company, or person shall employ a weighman, and the miners working in any such coal mine may employ another such weighman, and the two so employed shall supervise the weighing of each car while empty, and the weighing of the same when loaded with coal so paid for by weight, and the measuring of the number of bushels therein, when necessary, so paid for by measure. But, if the miners fail to employ such weighman, then the person so employed by such corporation, company, or person shall perform that duty. Each of the persons so employed, before entering upon the discharge of the duties of his employment, shall take and subscribe an oath or affirmation that he will honestly and impartially do and perform the duties of his employment, and do equal and exact justice between employers and employes interested in the matter of his employment, to the best of his judgment, skill, and ability.

"(5) In any county in which the mine inspector is required to act as herein mentioned, the County Court of such county shall furnish him with whatever is necessary to enable him to discharge his duties, if such court has procured the weights and measures and balances provided for by chapter fifty nine of the Code of West Virginia; and, if not, the State sealer of weights and measures shall furnish him with whatever may be necessary to enable him to discharge the duties hereby required of him, and the things so furnished him, in either case, shall be returned by him to the person from whom he received them as soon as possible after he has performed the duties for which he received them. But it shall be the duty of every corporation, company, or person so engaged in the business of mining coal to procure and constantly keep on hand a sealed weight of at least fifty pounds, and a scaled measure of at least one bushel, to be used for the purposes of this act.

"(6) Any corporation, company, or person violating any of the provisions of this act shall be guilty of a misde-

meanor, and, upon conviction thereof, shall for each offence be fined not less than twenty five dollars, and not more than five hundred dollars; and the officer, agent, or employes of the corporation or company whose duty it was to do or perform the act, or to cause it to be done and performed, which is the subject of the indictment, may be indicted jointly with said corporation or company, and upon conviction thereof, in the discretion of the court, he may be imprisoned in the county jail not less than ten, nor more than sixty, days.

"(7) This act shall not apply to any corporation, company, or person owning or operating a coal mine in which less than ten miners are employed.

"(8) It shall be the duty of every court in each county in which any such coal mine is operated, and in which a grand jury is impannéled, to give this act in charge to the grand jury."

The plaintiff in error was indicted and found guilty— *First*, for a violation of chapter 82 of the Acts of the Legislature of 1891, which provides for the weighing and measuring of coal at the place where mined, before the same is screened. The plaintiff in error was indicted, *secondly*, and found guilty, of violating the provisions of chapter 76 of the Acts of the Legislature of 1891, which prohibits the employer from issuing scrip, not redeemable in money, in payment of wages due to laborers.

The record embraces four indictments—two for the offence first named above, and two others for the offence last named. We shall proceed to consider the indictments marked respectively 4 and 5, and shall not find it necessary to consider those marked respectively Nos. 1 and 2. There is perhaps no material difference between the two sets of indictments, but the rules and decisions of this Court inhibit us from taking into consideration the indictments numbered 1 and 2 respectively, for the reason that it was admitted at the bar of this Court that they were drawn by the counsel for the defendant, and were intended, therefore, to present to this Court the questions involved in a moot form. This Court has several times decided that it will not hear and determine moot questions; that is to say, abstract questions upon

formal issues made up by the mutual consent and agreement of the counsel of the opposing contestants. *Stockton* v. *Copeland,* 23 W. Va. 696; *Leigh* v. *Ripple,* 27 W. Va. 214.

The question to be decided by the Court is whether the said two acts are contrary to the constitution of this State, or to that of the United States, and null and void on account of contravention of either or both of those constitutions. First, let us consider some general facts and considerations applicable to both of the laws named.

It has been declared by a distinguished writer that the discussion of that head of constitutional law, prescribing bounds, which the legislature itself can not transcend, is peculiar to American Jurisprudence. Sedg. St. Const. Law, 405.

We can not entirely subscribe to this view, as a matter of history. The accurate student of English history, particularly of the debates in parliament, will be struck with the fact of the general recognition of a residuum of power in the nation or commonwealth itself, greater still than that of the parliament. The maxim of the omnipotency of parliament, according to Locke and Milton, was rather a legal fiction than a reality. The American Revolution was a protest against the alleged omnipotency of parliament, and settled the principle, that the colonies could not be taxed without their consent even by act of parliament. 2 Amer. Archives 1775, p. 248. To change the organic structure of the government, including parliament itself, was doubtless within the power of the nation, as seems to have been established by "the glorious revolution" of 1688.

However this may be, it is perhaps indisputable that that branch of jurisprudence which permits the court of last resort to pronounce an act of the legislature null and void, because in conflict with the provisions of the constitution, is peculiar to American institutions. It is a very valuable principle, and has been frequently invoked in the judicature of both the States and the General Government.

A further principle, at one time held in some doubt, but now, as we think, finally decided, is that the judiciary can not annul or pronounce void any act of the legislature upon any other ground than that of repugnancy to the constitu-

tution. It was at one time supposed that the judiciary could resort to the principles of natural justice or common right, and pronounce a legislative act void because in conflict with such supposed principles. This view however, I think, we may regard as finally abandoned. In fact one of our earliest writers upon this subject lays down the principle, which has been sanctioned and adopted by our own State, "that, although an act of the legislature contrary to the first principles of the social compact is not rightful—as, for instance, to make a man judge in his own cause; or seizing the property of the citizen, honestly acquired, without compensation; or retrospective laws in general—yet it seems the law can not be declared void by a court of justice merely because it violates these general principles, if not prohibited by the constitution of the State in which it is passed, or of the United States," Serg. Const. Law, 348; Tied. Lim. p. 7, § 2, and notes. And it has been so held in our own Court in *Slack* v. *Jacob*, 8 W. Va. 612, where it is said that "the courts have no right to arrest or nullify a law passed in relation to a subject within the scope of the legislative authority, on the ground that it conflicts with their notions of natural right, absolute justice, or sound morality."

It may be said, therefore, that the doctrine of a higher law than the constitution has no longer any foothold in American jurisprudence.

In the further discussion of the questions involved, another principle may be referred to, which is of almost universal application, and that is, *where peculiar privileges are granted by the State, peculiar responsibilities supervene, and special regulations may be imposed.* The bestowal and reception of unequal privileges beget legitimately the right to impose unequal burdens. This propositon is of general application in every system of ethics, legal, moral, or political. Its foundation stone is the maxim, universally accepted, that "every right has its duty, and every duty its corresponding right."

The elementary writers have expressed this principle in different phrase, but all, so far as I know, have subscribed to it. For example, Mr. Tiedman says: "It is only in extra-

ordinarily abnormal cases that any one man can acquire this power over his fellowmen, unless he is the recipient of a privilege from the government or is guilty of dishonest practices. The remedy for the first case in a constitutional goverment is to withhold dangerous privileges, or, if the grant of them is conducive to the public welfare, to subject their enjoyment to *police regulation,* so that the public may derive the benefit expected, and receive no injury." Tied. on Police, p. 242, § 95.

This principle underlies the whole doctrine of license, of corporate power, and the regulation of monopolies. Id. p. 273, § 101; *License Cases,* 5 How. 504; *Butchers' Ben. Ass'n v. Crescent City, etc. Co.,* 16 Wall. 36; Cooley, Const. Lim. 586, 596; Id. 575–577.

At common-law, attaching to all corporations was a visitorial power, or power of surveillance, lodged primarily in the king. 1 Broom & H. Comm. 582, and note; *King v. Masters and Fellows of St. Catherine's Hall,* 4 Term R. 233, 244; *Ex parte Wrangham,* 2 Ves. Jr. 609, 619.

First, with regard to corporations : They are the recipients of extraordinary privileges from the State, insomuch that they are now almost universally resorted to in preference to partnerships and other association of capital. In no State in the union have they such an extensive endowment of special privileges as in our own State, insomuch that from every one of our sister States comes a multitude of applications for charters, because in their own States exist regulations and restrictions of a conservative character, which are not to be found in our own Code of Laws. It would naturally be supposed, therefore, that a State, in which there is so much lavishness of bounty in conferring privileges upon corporations, should reserve to herself the power to regulate, alter or repeal charters, and to exercise expansive and remedial police powers necessary to prevent abuse. If persons engaged in extensive industries, such as coal mining, desire to retain every privilege which pertains to ordinary private property, they should be careful not to apply to the sovereign power for those extraordinary privileges which attach to a charter of incorporation in this State. A charter of incorporation is a franchise, which is

defined to be "a royal privilege or branch of the king's prerogative subsisting in the hands of a subject." 2 Bl. Comm. 37; *Bank* v. *Earle*, 13 Pet. 595.

We will now proceed to enumerate the privileges of an extraordinary and special character enjoyed by the defendant in this case, in order to enable us to understand and decide whether the laws in question are within the power of legislative capacity, as an exercise of police power, or whether they are in violation of the constitution.

In the first place, the constitution of this State describes charters as "grants of special or exclusive privileges." Const. Art. XI, § 3; Code, c. 53, § 4. In addition to the incidents which pertained to them at common-law, our Code has, with a bountiful and liberal hand, expanded their powers. To take as an example the defendant in this case, it enjoys the right of eminent domain. See section 7, c. 50, Acts 1887; Code Append. p. 994. In the exercise of this supreme power, delegated by the State, it can build a lateral railroad. See Code, c. 54, § 69*a*. It can hold ten thousand acres of land, the limit in this respect being in excess of what may be acquired and held by any other species of internal improvement companies. Id. c. 53, § 52. It can lay out a town or city. Id. c. 52, § 4. Moreover, in its organization as a company for mining coal, it is granted a peculiar privilege by an amendment introduced into our laws for that purpose. Id. c. 54, § 82*a*.

In order to facilitate the coal-mining interests of the State, section 24 of chapter 53 of the Code, was amendes and re-enacted, first in 1882, and then again March 10, 1891, whereby the extraordinary privilege was bestowed upon *mining-corporations alone* of disposing of their stock at less than par, and negotiating the same in payment of real and personal estate, and permitting subscribers to the capital stock to pay for the same by the transfer and conveyance of real or personal property, upon such terms as may be mutually agreed upon. Acts 1891, c. 85, p. 215.

It is further found that, under our Code, every corporation chartered under the laws of this State is required to take out a State *license* before doing or attempting any business in this State. The defendant is therefore not only

a corporation, but a licensee.  The sections of the Code which require it to take out a license exact the same of circuses, menageries, theaters, operas, peddlers, auctioneers, stockbrokers, moneybrokers, pawnbrokers, bankers, hotels, restaurants, vendors of spirituous liquors, distillers, brewers, bowling alleys, skating rinks and shooting galleries.  See Code (1891) c. 32, ss. 1, 2.

Licenses are of two characters—one a license for revenue, and the second conferring authority to engage in "vocations which need special surveillance." Cooley, Const. Lim. 586-587.  From the class of subjects with which the requirement of a license from a corporation is associated, as will be seen by the two sections of the Code just referred to, it is evident that the corporate license belongs to the latter character, and is granted and required as a police regulation.  Such a license is defined to be "essentially the granting of a special privilege to one or more persons not enjoyed by citizens generally, or at least, not enjoyed by a class of citizens to which the licensee belongs." And, Law Dict. p. 622, subject "Licensee." The same author says: "A license is issued under the police power."

It may be well here to observe that while our Code is liberal, and, as many think, extravagant, in conferring extraordinary powers upon corporations, it has yet reserved to the legislature the power of altering and amending all charters of incorporation.  In chapter 53, § 8, we find the following sentence:  "And the right is hereby reserved to the legislature to alter any charter or certificate of incorporation hereafter granted to a joint-stock company, and to alter or repeal any law applicable to such company." Section 10 of the same chapter is as follows:  "Every joint-stock company which shall be hereafter organized or commence its corporate business, or which shall accept the provision of this chapter, or be declared subject thereto by act of the legislature, shall, so far as it is not otherwise expressly provided, have the rights, powers, and privileges, and be subject to the regulations, restrictions, and liabilities, specified in this and and the preceding chapter."

Having thus examined the character of the defendant, and the relation which it bears to the State, we will now

proceed to consider whether the two acts in question are in violation of the constitution of West Virginia, or that of the United States. In the case of *State* v. *Workman*, 35 W. Va. 367 (14 S. E. Rep. 9) we reasserted at the last special term of this Court the doctrine heretofore laid down, that we had no authority to pronounce an act of the legislature unconstitutional, and for that reason void, except in cases where the infringement or violation was so plain as to be beyond all reasonable doubt. See *Osburn* v. *Staley*, 5 W. Va. 85.

In the case of *Slack* v. *Jacob*, 8 W. Va. 612, it was held

"(1) It is the duty of a court to uphold a statute when the conflict between it and the constitution is not clear, and the implication which must always exist, that no violation has been intended by the legislature, may require in some cases, where the meaning of the constitution is in doubt, to lean in favor of such a construction of the statute as might not, at first view, seem most obvious and natural. Where the meaning of the constitution is clear, the court, if possible, must give the statute such a construction as will enable it to have effect."

"(2) It is always to be presumed that the legislature designed the statute to take effect, and not to be a nullity.

"(3) Wherever an act of the legislature can be so construed and applied as to avoid a conflict with the constitution, and give it the force of law, such construction will be adopted by the court."

"(6) The expediency or inexpediency of an act is a question for the legislature, and not for the court."

"(14) The judiciary can not inquire into the motives and necessities which may have superinduced the passage of an act. (15) The courts have no right to set aside, to arrest, or nullify a law passed in relation to a subject within the scope of the legislative authority, on the ground that it conflicts with their notions of natural right, absolute justice, or sound morality."

These principles, thus clearly announced by this Court, are sustained by all the best authorities, by the elementary writers and by the Supreme Court of the United States. In the leading case of *Munn* v. *Illinois*, 94 U. S. 113, it is said by Chief Justice WAITE that "laws may be changed

at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations." In the same case it is said : "For our purposes, we must assume that, if a state of facts could exist that would justify such legislation it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state, but, if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge."

The provisions of the State constitution which, it is argued, have been violated by the two acts we are considering, are the following :

"All men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they can not by any compact deprive or divest their posterity, namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety." Bill of Rights, § 1.

"No person shall be deprived of life, liberty, or property without due process of law and the judgment of his peers." Id. § 10.

The first section was, in substance, inserted in the bill of rights of the convention of Virginia, which assembled at Williamsburgh on the 20th of March, 1775. The same principle was subsequently embraced in the declaration of independence on the 4th of July, 1776, and has been preserved and brought down to us in the preamble to "the civil rights bill."

It would be in vain to look to the laws of England, written or unwritten, for a declaration or institution which made all men equal before the law ; for by the laws of that kingdom, from the earliest institutions of Alfred down to the present time, the whole framework of the government was based upon classes, titles, ranks and precedence. There was—*First*, the royal family ; *secondly*, the highest order of ecclesiastic office ; *thirdly*, the nobility ; *fourthly*, the esquires

and gentry ; *fifthly*, the yeomen ; and, *lastly*, "the rest of the commonalty are tradesmen, artificers, and laborers." 1 Bl. Comm. 407.

Likewise we are told by Mr. Reeves in regard to the statutes of Rich. II.: "The statutes of laborers made in the last reign were confirmed, and further regulations were made on this subject. The lower orders of people were, in consideration of law, divided into servants, laborers, artificers, and beggars ; and different regulations were provided for them, as they came under one or other of these descriptions."

Again he says: "To prevent disorders, it was ordained (St. 12 Rich. II c. 6) that no servant, laborer, nor artificer should carry a sword, buckler, or dagger, under pain of forfeiting the same, except in time of war, or when traveling with their masters ; but they might have bows and arrows, and use them on Sundays and holidays. They were required to leave all playing at tennis or football and other games called quoits, dice, casting of the stone kail, and other such importune games. All offenders against this statute might be arrested by sheriffs, mayors, bailiffs, and constables, and their arms taken away."

The price of labor was adjusted as a police regulation· 3 Reeves, Eng. Law (Ed. 1880) 365, 366, 413, 414. By St. 5 Eliz. c. 4, persons having no visible livelihood were compelled to go out to labor, and many other regulations were enforced, which we are told "seem never to have been repealed." Upon this subject, see Broom & H. Comm. 511, and notes, where we are told that, at common law, "laborers constitute the third class of servants ; they are generally hired by the *day* or week, and do not live *intra menia* as part of the family. Concerning laborers various statutes have made regulations." It will be seen, therefore, that the right to regulate labor was frequently exercised by parliament, and existed at common law as the exercise of a police power.

Under our American institutions and constitutions, happily, however, all class distinctions have been abolished, and all men are equal before the law. Class legislation, founded upon any distinctions of rank or wealth, is contrary to the genius of our institutions. It is claimed that

the acts in question are infringements of the first section of the bill of rights, because they impair the enjoyment of liberty, and interfere with and limit the means of acquiring and possessing property.

These terms, it must be admitted, are vague and indefinite when we come to measure by them a limitation upon the police power of the State. Can hackmen, ferrymen, and all the other licensees of the State invoke protection from this clause of the constitution, and claim immunity from the payment of license fees and other appropriate police regulations? It has been held by all the better authorities that they can not, and for two reasons—*First*, because they are in the enjoyment of a peculiar privilege derived from the State, which makes their business, as we have seen, essentially a monopoly; and, *secondly*, because they are engaged in a vocation peculiarly the subject of public surveillance.

An extreme case of the exercise of this police power over a trade or calling is that of *Mobile* v. *Yuille*, 3 Ala. 140, which was quoted and approved in *Munn* v. *Illinois*, 94 U. S. 129. The question before the court in that case was whether the power granted to the city of Mobile to regulate the weight and price of bread was unconstitutional. It was contended that "it would interfere with the right of the citizen to pursue his lawful trade or calling in the mode his judgment might dictate." That is exactly the argument which is presented in the present case, as based upon the article of the constitution which we are now considering. In that case, which embodies a very able review of the whole subject, the court says:

"There is no motive, however, for this interference on the part of the legislature with the lawful actions of individuals, or the mode in which private property shall be enjoyed, unless such calling affects the public interest, or private property is employed in a manner which directly affects the body of the people. Upon this principle, in this State tavern keepers are licensed and required to enter into bond, with surety, that they will provide suitable food and lodging for their guests, and stabling and provender for their horses, and the County Court is required, at least once a year,

to settle the rates of innkeepers.   Upon the same principle is founded the control which the legislature has always exercised in the establishment and regulation of mills, ferries, bridges, turnpike roads and other kindred subjects.   So, also, all quarantine and other sanitary regulations, all laws requiring houses to be built in cities of a certain material, to guard against fire, depend for their validity on the same principle." :

The inspection and regulation of weights and measures have always been regarded as proper subjects of police supervision.   Code (1891) pp. 151, 589; 1 Bl. Comm. 274. A law providing for the weighing of coal and other articles of heavy bulk on the public scales has been held to be a constitutional exercise of police power.   *City Council* v. *Rogers*, 2 McCord, 495.   So, also, in *Stokes* v. *New York*, 14 Wend. 87; it was held that a city ordinance may require hay or coal to be weighed by city weighers.   So, also, provisions for the sale of oleomargarine or other artificial butter (such as that of our State, which requires such artificial products to be colored pink) are constitutional, and are reasonable police regulations, as tending to prevent fraud.

Upon the whole, therefore, we are not able to say that the legislature has transcended its inherent power to make reasonable police regulations, or that it has violated the article of the constitution of this State above quoted.   We base this decision in this case—*First*, upon the ground that the defendant is a corporation in the enjoyment of unusual and extraordinary privileges, which enables it and similar associations to surround themselves with a vast retinue of laborers, who need to be protected against all fraudulent or suspicious devices in the weighing of coal or in the payment of labor; *secondly*, the defendant is a licensee, pursuing a vocation which the State has taken under its general supervision for the purpose of securing the safety of employes, by ventilation, inspection and governmental report, and the defendant, therefore, must submit to such regulations as the sovereign thinks conducive to public health, public morals or public security.

We do not base this decision so much upon the ground that the business is affected by the public use, but upon the

still higher ground, that the public tranquility and the good and safety of society demand, where the number of employes is such that specific contracts with each laborer would be improbable, if not impossible, that in general contracts justice shall prevail as between operator and miner; and, in the company's dealing with the multitude of laborers, with whom the State has by special legislation enabled the owners and operators to surround themselves, that all opportunities for fraud shall be removed.

The State is frequently called upon to suppress strikes, to discountenance labor conspiracies, to denounce boycotting as injurious to trade and commerce; and it can not be possible that the same police power may not be invoked to protect the laborer from being made the victim of the compulsory power of that artificial combination of capital, which special State legislation has originated and rendered possible.

It is a fact worthy of consideration, and one of such historical notoriety that the court may recognize it judicially, that every disturbance of the peace of any magnitude in this State since the civil war has been evolved from the disturbed relations between powerful corporations and their servants or employes. It can not be possible that the State has no police power adequate to the protection of society against the recurrence of such disturbances, which threaten to shake civil order to its very foundations.

Collisions between the capitalist and the workingmen endanger the safety of the State, stay the wheels of commerce, discourage manufacturing enterprise, destroy public confidence, and at times throw an idle population upon the bosom of the community. Surely the hands of the legisture can not be so restricted as to prohibit the passage of laws directly intended to prevent and forestall such collisions.

It has been held that it was not unconstitutional, as a police regulation, to require railroads to fence their tracks, although others may not be required to inclose their lands; also that a law requiring such corporations to pay for live stock killed on the track is not an unwarranted exercise of police power; and this not so much upon the ground of

protecting stock, but as chiefly "essential to the protection of persons being transported in the railway carriages." Cooley, Const. Lim. 579; *Railroad Co. v. Beckwith*, 129 U. S. 26, 34 (9 Sup. Ct. Rep. 207).

If such legislation, directed against one class of corporations only, is not objectionable as class legislation, it is difficult to see why laws directed against other corporations, and directly intended to prevent popular disturbance and discontent, by regulating the manner of weighing coal, and prohibiting what is popularly known as the "pluck-me" method of payment, should not be deemed a legitimate exercise of the police power of the State.

In 1882 was passed a most elaborate and comprehensive act to regulate the working, ventilation, and drainage of coal-mines. The State was divided into two mining districts, and the most minute and careful enumeration of methods and duties intended to promote the health and protect the lives of coal-miners was inserted. Since this law went into operation, annual reports by the inspectors have been returned to the executive of the State.

These statistics collected by these reports show in this State an enormous increase in the past decade in the production of coal, the amount of labor employed, and the number of accidents. For example, in 1880, the number of laborers employed, inside and outside, was, in round numbers, three thousand six hundred. In 1891 it was, in round numbers, thirteen thousand; while the number of tons of coal produced in 1880 was nine hundred and fifty four thousand, and in 1891 it was, in round numbers, seven million three hundred thousand tons.

Further police regulations have prohibited the employment of females, and minors under twelve years of age. This legislation was followed up by the act of 1887, c. 63, which applied only to persons, firms, and corporations or associations engaged in mining or any kind of manufacturing, but not to any other class or classes of persons. The third section of the act prohibited the issuance by such manufacturers or mine owners of any order or other paper whatsoever for the payment of labor, unless it purported to be redeemable for its face value in lawful money of the

United States, bearing interest at the legal rate, and redeemable within a period of thirty days, *etc.* This section was pronounced unconstitutional in the case of *State* v. *Goodwill*, 33 W. Va. 179 (10 S. E. Rep. 285).

Under a provision of our constitution, this Court prepares the syllabus in each case reported, and that duty is not left to the reporter. It is to the syllabus, therefore, and not to the opinion, that we are accustomed to look for precedents binding upon this Court. The syllabus in the case last cited is as follows :

"(1) It is not competent for the legislature, under the constitution, to single out owners and operators of mines and manufacturers of every kind, and provide they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make. Such legislation can not be sustained as an exercise of the police power. (2). The third section of chapter 63, Acts 1887 (Code 1887, p. 983) which prohibits persons engaged in mining and manufacturing from issuing for the payment of labor any order or paper, except such as is specified in the said act, is unconstitutional and void."

It will be seen, therefore, that it was this invidious distinction, separating miners and manufacturers from the rest of the community, and imposing upon them burdens not inflicted upon others, that rendered that act of 1887 unconstitutional, and made the legislation embraced therein distinctly class legislation.

In the act which we are now considering this objection is carefully and entirely removed, as will be seen by inspection of section 1, c. 76, Acts 1891, wherein it is provided that it shall be unlawful for any corporation, company, firm, or person engaged in any trade or business to issue to employes, in payment of wages, any scrip, token, draft, check, or other evidence of indebtedness, payable or redeemable otherwise than in lawful money.

The consideration of the present question, therefore, is not at all affected or controlled by the syllabus in *State* v. *Goodwill, supra.* The power of the legislature to declare

the nature and effect of contracts, validating some, and invalidating or entirely 'prohibiting others, has never been questioned._ Thus, contracts for wagers, or for usurious interest, have been prohibited.

The statute of fraud and perjuries invalidates parol contracts upon certain subjects for the purpose of preventing *fraud.* If in the present case a similar purpose can be attributed to the legislature, then, under the rule laid down and heretofore quoted from *Munn* v. *Illinois,* we shall not be at liberty to pronounce this act unconstitutional.

The legislature has, moreover, fixed the *status* of notes, defining what are negotiable or otherwise, withdrawing the quality of negotiability from all mercantile paper not payable at a banking house. It has prohibited a very large number of contracts on the part of married women in respect to their own private property, which hitherto were lawful and binding.

It seems clear to my mind that both of the acts which we are now considering were passed with a view of cutting off opportunities for fraud, and therefore they were fairly within the police power of the legislature.

In regard to chapter 82, under the third section of which this indictment, No. five, was drawn, the first section of the act requires that no other scales or measures than those which are correct shall be used, and that the public sealer of weights and measures may be invoked by the operators or by the miners to test the accuracy of such weights and measures. The second section relates to the marking of the cars used by the operators in removing the coal from the mine. These two sections are as plainly included in the exercise of police power as is the marking of pound and ounce weights, and sealing of the same, for merchants and others, by the sealers of weights and measures, required by law to be appointed for each county. Code 1891, pp. 589, 591.

This third section appears to my mind just as clearly the exercise of a police power. It provides that all coal mined and paid for by weight shall be weighed in the car in which it is removed from the mine before it is screened, and shall be paid for according to the weight so ascer-

tained, at such price per ton as may be agreed on by such owner or operator and the miners; and that coal mined and paid for by measure shall be paid for according to the number of bushels marked upon each car in which it is removed from the mine, and before it is screened, and the price paid for each bushel so ascertained shall be such as shall be agreed on asaforesaid.

The objection urged against this provision is that it requires the operator to pay for all the coal that the miner digs, whereas, it has been customary, as has been alleged, and as was perhaps admitted by the counsel on both sides, to pay only for such coal as would not pass through the screen. The legislature evidently thought the screen a fraud, and, so far as it enters as an element in determining what coal resulting from his labor the miner shall be paid for, the screen is abolished. The law may have been unwise or injudicious; with that we have nothing to do. If it were passed by the legislature in the exercise of a police power, we have no authority to annul the act.

"But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty—the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates, and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States. And when the validity of a State law, making regulations of commerce, is drawn into question in a judicial tribunal, the authority to pass it can not be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade." License Cases, *Peirce* v. *State of New Hampshire,* 5 How. 583.

Again, it was said in *Beer Co.* v. *Massachusetts*, 97 U. S. 32: "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature can not be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer."

So far, therefore, as these laws are supposed to conflict with the constitution of our own State, it only remains to consider one or two cases from the Reports of sister States, in passing upon similar laws.

First, we are pointed by counsel to the case of *Godcharles* v. *Wigeman*, 113 Pa. St. 431 (6 Atl. Rep. 354) in which a similar law was decided to be unconstitutional in that State. The decision rested upon a peculiar provision of their constitution, as follows: "The general assembly shall not pass any local or special law * * * regulating labor, trade, mining, or manufacturing, * * * granting to any corporation, association, or individual any special or exclusive privilege or immunity." Section 7, Art. III, Const. Pa.

In our State we have no such constitutional provision; if we had, the defendant and other mining companies could not have been clothed with the "special and exclusive privilege" of watering stock, holding ten thousand acres of land, and laying out towns and cities. After the above decision was rendered, the legislature of Pennsylvania effected its remedial legislation by prohibiting altogether mining or manufacturing companies from carrying on "company stores," or "general supply stores," where any goods or merchandise are sold, other than those mined or manufactured by themselves. Laws Pa. 1891, p. 256.

The case of *Hancock* v. *Yaden*, 121 Ind. 366 (23 N. E. Rep. 253) held that "the act of the legislature of Indiana requiring the owners of mines to pay for mining coal every two weeks in lawful money of the United States was constitutional." In the opinion, page 368, 121 Ind., and page 253, (23 N. E. Rep.) the court says: "Our judgment is that the provision of the statute forbidding the execution of contracts, waiving a right to payment in money, is one that the legislature had power to enact." On page 369, 121

Ind., and page 254; (23 N. E. Rep.) the court gives its reasons for this opinion, covering substantially the ground we have gone over. In conclusion that court says :

"The statute operates on both the employer and employe. It may, it is true, in its practical operation, especially benefit the wage-earner; that is no fault. At all events, the fault is not such a grievous one as to compel the courts to strike it down. It fixes no price on any man's labor. It leaves the parties to do that. But it does require them to refrain from contracting, before the relation of employer and employe begins, for payment in anything except the lawful money of the United States. It does not preclude parties from making an accord and satisfaction after wages have been earned and services rendered, although it does command that the antecedent contract shall not provide that payment may be made in some other thing than lawful money of the nation."

A similar decision was rendered with reference to a similar law passed by the legislature of Maryland. See *Shaffer v. Mining Co.*, 55 Md. 74. In the opinion of the court it is said: "It being conceded that the legislature, when it incorporated the Union Mining Company, reserved the right to alter or amend its charter at pleasure, there can be no doubt that the legislature could enact a law prohibiting the corporation from paying its employes otherwise than in money, and that it could forbid the corporation from making contracts with them for payment in anything but money."

It is maintained, however, that these acts are in conflict with the fourteenth amendment of the constitution of the United States (1) in that they abridge the privileges and immunities of the citizens of the United States; (2) that they deny to the plaintiff the equal protection of the laws; and (3) that they deprive the defendants of their property without due process of law, contrary to the provisions of the first section of the fourteenth amendment.

In the celebrated *Slaughterhouse Cases*, 16 Wall. 36, it was held that it was only the privileges and immunities of the citizens of the United States which are placed by this clause under the protection of the federal constitution, and

that those of the citizens of the State, whatever they may be, are not intended to have any additional protection by this paragraph of the amendment. It is not necessary, therefore, further, to discuss whether the citizens of this State, or the creature of the State, as the defendant in this case is, can derive any further protection from the paragraphs of the fourteenth amendment over and above that which it enjoys under our State constitution.

We think the reasoning and authority of the *Slaughterhouse Cases* a sufficient answer to the objection we are considering. The fourteenth amendment was never intended to strike down the police power of the State, nor to control its exercise, except in cases where it (the act) amounts plainly to usurpation, and the wresting of private property from its legitimate owners without compensation. We see nothing in the legislation now under consideration which could properly be so characterized or regarded as in conflict with the fourteenth amendment.

The case of *Railroad Co.* v. *Beckwith*, 129 U. S. 26 (9 Sup. Ct. Rep. 207) would seem to be entirely applicable. In that case it was held that a provision in the Code of Iowa authorizing the recovery of double the value of the stock killed or damages caused thereto by a railroad engine, when the injury took place at a point on the road where the corporation had a right to erect a fence and failed to do so, and when the accident was not occasioned by the willful act of the owner or his agent, was not in conflict with the fourteenth amendment of the constitution of the United States. It was there expressly held that that amendment does not limit the subjects in relation to which the police power of the State may be exercised for the protection of its citizens.

Again, in *Dent* v. *State*, 129 U. S. 114 (9 Sup. Ct. Rep. 231) in a case arising in this State, and taken on appeal from this Court to the Supreme Court of the United States, it was held that "legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred

matters—that is, by process or proceedings adapted to the nature of the case; and such is the legislation of West Virginia in question."

That case, which is accompanied by an exceedingly able opinion, seems to me to cover all the points of objection which have been urged to the acts under consideration. On page 124, 129 U. S., and page 234 (9 Sup. Ct. Rep.) we find the following exposition:

"As we have said on more than one occasion, it may be difficult, but not impossible, to give to the terms 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as are forbidden. They come to us from the law of England, from which country our jurisprudence is to a great extent derived, and their requirement was designed to secure the subject against the arbitrary action of the crown, and to place him under the protection 'of the law. They were deemed to be equivalent to the 'law of the land.' In this country the requirement is intended to have a similar effect against legislative power; that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property. Legislation must neccessarily vary with the different objects upon which it is designed to operate. It is sufficient, for the purposes of this case, to say that legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters; that is, by process or proceeding adapted to the nature of the case."

Upon the whole, therefore, we can not but conclude that the acts in question are not so plainly and obviously in violation of the constitution of this State, or of the United States, as to justify us in interposing that highest function known to appellate courts; that of pronouncing null and void an act of the sovereign authority of the State. The judgments of the Circuit Court are affirmed.

LUCAS, PRESIDENT:

### ON REHEARING.

Upon the rehearing allowed by the Court in this case, elaborate and able arguments were filed and delivered by opposing counsel, and we have given them the most careful consideration. Counsel have considered the acts separately, and have called one the "Screening Act" and the other the "Scrip Act," and we will adopt this nomenclature.

### THE SCREEN ACT.

What we have said heretofore may be summarized as follows: The principle seems to be that when a few persons are engaged in an extensive business, and they have a multitude of customers or dependent employes, and it appears that the business is of such a character that the parties do not deal upon an equal footing, and that the many are at a disadvantage in their contractual relations with the few, the legislature may regulate these relations, with a view to prevent fraud, oppression or undue advantage. Familiar illustrations are contracts for the loan of money; for transportation of persons and freight; for insurance of life and property; for the manufacture and sale of lard and artificial butter; for measuring and inspecting lumber, grain, tobacco, flour, *etc.* The number of these peculiar subjects must vary as trade and commerce increase or drift into new channels. Thus the subject of insurance has been added within recent years, so far, at least, as my observation has extended. See *Assurance Co.* v. *Clements*, 140 U. S. 226 (11 Sup. Ct. Rep. 822).

In the State of Virginia all of the subjects above enumerated have, from the very earliest times, been the subject of legislative commercial regulation. Thus we find an act passed as early as 26th December, 1792, for regulating the inspection of pork, beef, tar, pitch and turpentine. 2 Rev. Code, 1819, p. 185. At various periods, flour, Indian meal, bread, salt, fish, pork, beef, lumber, lime, hemp, butter and lard were the subjects of commercial regulation.

Many of these laws were on our statute-book when our present constitution was adopted, and it is not at all probable, when the bill of rights was embodied in our constitution as a part thereof in 1872, that the framers intended to

curtail the police power of the legislature as theretofore exercised; nor is it to be supposed that they intended to prohibit the legislature from adding new subjects of police commercial regulation, as necessity might arise.

The mining of coal, as we shall see when we come to consider the scrip act, has been for a hundred years in England the subject of such police regulation. Though dropped for a season from the enumeration of articles in the legistion of Virginia, it has now been resumed by the legislature of this State in the act we are considering, and, as we think, in a perfectly reasonable and legitimate manner.

The objects of the acts we are considering seem to be— *First,* to protect against negligence by inspection laws, in order to protect miners in fulfilling contracts of labor as regards their health and lives; *secondly,* to protect them from fraud in measuring and paying for their earnings. If the first object of protection, namely, to protect life and health, be a legitimate subject for legislative interference with contractual relations between miners and operators or owners, upon what conceivable ground can it be maintained that the second object, namely, to protect against fraudulent practices, is not equally in the scope of the police power of the legislature?

This view of the case is so perfectly conclusive to my mind that no amount of argument or authority can add to its strength. And once concede that the coal industry is a proper subject for the exercise of police regulation, and it follows, by all the authorities, that the legislature, not the courts, is to judge of the propriety and reasonableness of any given regulation, provided that it be enacted for the avowed police purpose, and is not upon its face in excess of the police power claimed. In other words, if any conceivable circumstances would justify the exercise of such police power, the legislature, not the courts, is to judge of the existence or prevalence of such circumstances. See *Munn* v. *Illinois,* 94 U. S. 113.

So well satisfied am I that these laws are not only constitutional but also reasonable and just, that, so far as I am individually concerned, I do not question that they can be successfully maintained against all classes of persons em-

braced in their scope. But this Court is neither in duty bound nor ought it to decide in advance upon the guilt or innocence of persons not now before us, but who may probably come before us on some future indictment. We are not willing to prejudice any future trials by prejudging a different class of persons who might be indicted; because to interpret and pass upon these laws as to them would be to prejudge their cases, inasmuch as their main defence, judging from the present cases, might consist of an attack upon the constitutionality of the acts in question as applied to themselves. Should individual operators hereafter be indicted, the question as to the divisibility of the acts—whether they may be maintained against licensees and corporations, but not as against individuals—will properly arise.

There was one point urged in argument for defendant, which was not overlooked but was not perhaps sufficiently dwelt upon in the opinion, and that was that the screening act only applies to persons, companies or corporations operating a coal mine in which more than ten miners are employed. It is urged that this is "class legislation"—a term so loosely and vaguely applied as to defy any critical analysis of its meaning. The distinction drawn in favor of the smaller operators would indicate that the legislature thought that the evils of fraud and danger of imposition did not extend to the smaller classes of operators, and hence the remedy was not extended to their employes.

It is impossible to see how this distinction renders the act amenable to the charge of violating the fourteenth amendment of the federal constitution. This is our opinion, heretofore expressed, and it is confirmed by a recent decision of the Supreme Court of the United States, published since our opinion was announced. In *Budd* v. *New York*, 143 U. S. 517 (12 Sup. Ct. Rep. 468) the law of the State of New York, which was attacked as unconstitutional, was confined in its operation to cities having a population of one hundred and thirty thousand or more, and it was contended that this feature was in violation of the fourteenth amendment. To this contention the Supreme Court of the United States replied:

"It is further contended for the plaintiffs in error that the statute in question violates the fourteenth amendment, because it takes from the elevator owners the equal protection of the laws, in that it applies only to places which have one hundred and thirty thousand population or more, and does not apply to places which have less than one hundred and thirty thousand population, and thus operates against elevator owners in the larger cities of the State. The law operates equally on all elevator owners in places having one hundred and thirty thousand population or more, and we do not perceive how they are deprived of the equal protections of the laws, within the meaning of the fourteenth amendment."

The same reasoning applies exactly and with equal force to the case now before us.

#### THE SCRIP ACT.

In view of the elaborate argument presented on the motion to re-hear, I have thought it best to make some further observations on the so-called "Scrip Law," which prohibits persons engaged in mining, *etc.*, from issuing to their employes, in payment of wages, any store-order or check not payable or redeemable in lawful money.

More than a century ago the attention of the parliament of England was directed to the regulation of an admitted evil growing out of what was known in that country as the "Truck System." A law was passed in the reign of William IV. consolidating all previous laws upon the subject, prohibiting manfacturers of iron and certain other enumerated articles, and the miners of coal, salt, *etc.*, from paying their laborers in anything other than lawful money of the realm. See Truck Act, 1 & 2 Wm. IV. cc. 36, 37, 22 St. at Large, pp. 484, 490.

Now, what was the object of these enactments, and the motive for passing them? Mr. Black, in his Law Dictiontionary, thus defines the "Truck Act" under that title: "In English law this name is given to St. 1 & 2 Wm. IV. c. 37, passed to abolish what is commonly called the 'Truck System,' under which employers were in the practice of paying the wages of their work people in goods, or of requiring them to purchase goods at certain shops. This led

to laborers being compelled to take goods of inferior quality at a high price." Mr. Sweet, from whom this is taken, gives the same motive for passing the act. See Sweet Law Dict. tit. "Truck Act."

The motive is here declared to be to prevent fraud—an object which all concede to be a primary power to bring into operation the police machinery of the State. But we are not dependent upon conjecture or the concurrent opinions of the lexicographers and commentators to inform us as to the object of these laws, or that they originated in a police power which aimed to defeat fraud. We find this object enunciated on the very face of the "Truck Act" itself. The act consists of two chapters, 36 and 37. The thirty sixth chapter answers the purpose of a preamble, and enumerates the various antecedent acts which were to be repealed and consolidated into one, as embraced in the thirty seventh chapter. Those acts, as recited, were the following: 4 Edw. IV. c. 1; 8 Eliz. c. 7; 14 Eliz. c. 12; 1 Anne, c. 18; 9 Anne, c. 20; 10 Anne, c. 16; 1 Geo. I. c. 15; 12 Geo. I. c. 34; 13 Geo. I. c. 23; 13 Geo. II. c. 8; 22 Geo. II. c. 29; 29 Geo. II. c. 33; 30 Geo. II. c. 12; 17 Geo. III. c. 56; 19 Geo. III. c. 49; 57 Geo. III. cc. 115, 122; 58 Geo. III. c. 51.

Upon turning to the acts here enumerated, we find that they disclose in their titles the object of the intended legislation. The more important of them are as follows:

1 Anne, c. 18, entitled "An act for the more effectual preventing the abuses and frauds of persons employed in the working up the woolen, linen, fustian, cotton, and iron manufactures of this kingdom;"

12 Geo. 1, c. 34, entitled "An act to prevent unlawful combination of workmen employed in the woolen manufactures, and for better payment of their wages."

22 Geo. II, c. 27, entitled "An act for the more effectual preventing of frauds and abuses committed by persons employed in the manufacture of hats, and in the woolen, linen, fustian, cotton, iron, and silk manufactures, and for preventing unlawful combination of journeymen dyers, *etc.*, and of all persons employed in the said several manufactures, and for the better payment of their wages."

30 Geo. II, c. 12, "An act to amend an act made in the

twenty ninth year of the reign of his present majesty, entitled 'An act to render more effectual an act passed in the twelfth year of the reign of his late majesty, King George, to prevent unlawful combinations of workingmen employed in the woolen manufactures, for better payment of their wages,' and also an act for the better regulation of the woolen manufactures, and for preventing disputes among the persons concerned therein, and for limiting a time for prosecuting for the forfeiture appointed for the aforesaid act, in case of payment of the workmen's wages in any other manner than in money."

19 Geo. III. c. 49, entitled "An act to prevent abuses in the payment of wages to persons employed in the bone and thread-lace manufacture;" also an act to extend the provisions of an act of the twelfth year of his late majesty, King George I; and an act of the twenty second year of his late majesty, King George II., against the payment of laborers in goods or by truck, and to secure their payment in the lawful money of this realm;" also an act entitled "An act to extend the provisions of an act of the twelfth year of his late majesty, King George III., and an act of the twenty second year of his late majesty, King George II. against payment of laborers in goods or by truck, and to secure their payment in the lawful money of this realm to laborers employed in the collieries, or in the working and getting of coal, in the United Kingdom of Great Britian and Ireland."

These were some of the most important of the acts repealed and consolidated in the "Truck Act" of Wm. IV. Upon their very face they proclaim their object "*to prevent abuses and frauds,*" and they were therefore police regulations, in the strictest sense of the term. Down through the centuries, hand in hand, and consolidated into one police regulation, have come these conspiracy laws to protect capital, and these truck acts to protect labor, and both to protect society; and are we now to be told that the effect of adopting our free American constitutions is to leave in full vigor the power to protect capital, but to destroy the concomitant and correlative power to protect labor? The two powers, associated in their exercise for centuries, have

not been divorced by American institutions. Such an idea is not to be entertained for a moment. The American lawmakers are presumed to have known of the existence of these police powers at common-law, and in the statute law of England embedded for centuries, and it is not to be presumed, when they framed the restrictions of our constitutions, that they meant to prohibit the exercise of such police powers, when demanded in behalf of the security of society, and necessary to prevent fraud and abuse.

Holt, Judge:

"The legislative power shall be vested in a Senate and House of Delegates." Section 1, Art. VI, Const. W. Va. "The legislative, executive and judictial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others." Section 1, Art. V, Const. W. Va. "One branch of the government can not encroach on the dominion of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." Sinking Fund Cases, 99 U. S. 700–718. "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt." Id. Therefore to every act of the legislature a lawful purpose in the constitutional sense, as well as an intelligent purpose, must be ascribed.

So use your own property and rights as not to injure those of another or those of others collectively constituting the State, is a rule of law of universal application.

The legislative power to enforce this maxim is called the police power." The police power of a State, in a comprehensive sense, embraces its whole system of internal regulation by which the State may subject persons and property to all kinds of reasonable restraints and burdens in order to secure the general comfort, health and prosperity of the State, to preserve public order, prevent offences and to establish for the intercourse of citizens with citizens those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as it

is reasonably consistent with a like enjoyment of rights by others. This power, however, is subject to constitutional limitations both State and Federal. Section 10, Art. III. Const. W. Va.; section 1, Art. 14, Const. U. S.

Of such limitations the legislature must judge and is always presumed to judge correctly, unless the law in question plainly transcends them ; but this in our system necessarily makes it also a judicial question in the last resort; for it is for the courts in a practical case to declare such statute constitutional or unconstitutional. This legislative police power, so far-reaching, is necessarily changeable, as conditions and circumstances change ; which is an additional reason for caution and reserve in judicial supervision, while it must be confessed that its exercise is so constant and so multiform that there is a tendency to become disregardful of private rights and constitutional limitations. See Tiedm. Lim. Pol. Pow. 1–3, and note ; Cooley Const. Lim. c. 16, p. 572 ; "Liberty of Contract under the Police Power," an able article on the subject by Frederick N. Judson, Esq., in Amer. Law Rev., November, December, 1891, and authorities cited; *Budd* v. *New York*, 143 U. S. 517 (12 Sup. Ct. Rep. 468).

One of the laws in question, passed by the legislature of this State, is called the "Screening Act," and it is claimed by defendant to be in violation of the liberty of contract guarantied by both State and federal constitutions. Section 10, Art. III, Const. W. Va.; section 1, Art. XIV, Const. U. S.

To every legislative act a lawful purpose, in the constitutional sense, as well as an intelligent purpose must be ascribed. What is the object of this screening act? The title says : "An act providing for weighing and measuring coal at the place where mined, before the same is screened." The body of the act discloses the more particular object of requiring that the mining shall be paid . for according to the weight or measure thus ascertained before screening, at such price per ton or bushel as may be agreed on by such owner or operator and the miner who mined the same ; in short, on the basis of the "run of the mine."

Such exercise of the police power, in restraint of the liberty of contract, we must presume was put in force for the

general purpose of promoting certainty, and by consequence fair dealing, between the operator and the miner. It may not, in our opinion, tend to accomplish such object. It may be impolitic, unwise, imperfect. There may be need of repeal or of amendment. But can we say from anything on the face of the act or from anything, of which we can take judicial notice, that it is clearly and plainly an unreasonable and capricious invasion or restraint of the right or liberty to contract? See *Powell* v. *Pennsylvania*, 127 U. S. 768 (8 Sup. Ct. Rep. 992, 1257).

The legislative discretion of the State, in the exercise of the police power, must be, from the nature and necessity of the function, and the sovereignty of the body politic, indefinitely broad; and, as a matter of legislation in our own State and the mother State, has been given without question a very extensive scope in the power to restrict the freedom of contract. Of this our decisions, by necessary implication at least, and our statute-books past and present throughout our whole history furnish many illustrations and examples. Many of these laws relate to freedom of contract concerning matters not affected with any public use in the true sense only in the sense of the nature or extent of the private business being affected with a public interest, such as usury laws, statute requiring written evidences, some parts of the inspection laws, laws against selling spirituous liquors, the oleomargarine laws, law on selling commercial fertilizers, and, in some places, laws regulating contracts of insurance and *anti* trust laws. See Acts 1891, for preventing the wasting of natural gas. Code W. Va. 1891, p. 1060. Of the perfect right in the legislature to do most of these things "no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned." Cooley, Const. Lim. 574, citing REDFIELD, C. J., in *Thorpe* v. *Railroad Co.*, 27 Vt. 149.

On the other hand, the judicial power of supervision and ultimate control, when the contract relates to matters private, not affected with a public use in the strict sense, although of vital importance and within its proper sphere requiring to be rigidly upheld and enforced, must from the very nature of the case be limited and definitely restricted to such

statutes as appear on their face, or from facts judicially known, so capricious, so unreasonable, as to be clearly and plainly in violation of the constitutional guaranties. "Every possible presumption is in favor of the validity of the statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government can not encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." *Sinking Fund Cases* 99 U. S. 718.

If the statute in question restrains the liberty of contract in regard to a business affected with a public use in the true and proper sense of the term then, I take it from the arguments, it is confessedly constitutional. What I have said is confined to the supposition that the business of coal mining dealt with by the statute is a private business in the strict and proper sense; although, from its magnitude and importance, the number of persons employed, its dangers, the importance of preventing waste, its relation to the commerce of the State, and the fact that it is already minutely regulated and controlled by our "mining law," may, in such secondary sense, affect such business with a public interest. See "Mining Law," Code (Ed 1891) p. 991. For a full and recent discussion of the term, "affected with a public interest," as determined by the nature and extent of the business, see opinion by Blatchford, J., in *Budd* v. *New York*, 143 U. S. 517 (12 Sup. Ct. Rep. 468) (Feb. 29, 1892;) also dissenting opinion of Brewer, J. How far this Act may be objectionable as being what the counsel call "paternal legislation" I have not considered, deeming that a matter for the legislature, not for the courts.

I can not pronounce this law unconstitutional beyond a reasonable doubt. The remedy, if any be needed, is with the legislature by repeal or amendment.

English, J. (*dissenting*).

After a careful consideration of the arguments which were submitted in these cases when they were originally heard, and which have been presented upon the re-argument, and a thorough examination of the authorities

cited both by the representatives of the State and the plaintiff in error, I have reached the conclusion that the validity of the acts under which the indictments were found can not be sustained, for the reason that one is in restraint of trade and the other in contravention, not only of section 10 of Article III of the bill of rights of the State, but also of section one of the fourteenth amendment of the constitution of the United States.

The judgments which were under consideration by this Court, and upon which an opinion was handed down at a former term, were upon indictments Nos. four and five, the former of which was found under section 1, c. 76, Acts 1891, familiarly known as the "Scrip Law;" and the latter under section 3, c. 82, Acts 1891, "providing for weighing and measuring coal at the place where mined, before the same is screened," which section provides that "all coal so mined and paid for by weight shall be weighed in the car in which it is removed from the mine before it is screened, and shall be paid for according to the weight so ascertained, at such price per ton as may be agreed on by such owner or operator and the miners who mined the same; and coal mined and paid for by measure shall be paid for according to the number of bushels marked upon each car in which it is removed from the mine, and before it is screened, and the price paid for each bushel so ascertained shall be such as . may be agreed on as aforesaid."

Section one of the same chapter, provides that "it shall be the duty of every corporation, company, or person engaged in the business of mining and selling coal, by weight or measure, to procure and constantly keep on hand, at the proper place, the necessary scales and measures, and whatever else may be necessary to correctly weigh and measure the coal as mined by such corporation, company, or person."

Now, it will be perceived that this requirement does not apply to corporations alone, but the language is: "It shall be the duty of every corporation, company, or person enagaged in the business of mining and selling coal," *etc.* Let the mine-owner be an individual, a firm, or a corporation when the mining operation is commenced. The act is imperative that "the coal shall be weighed in the car in which it is re-

moved from the mine before it is screened, and shall be paid for according to the weight so ascertained."

The learned counsel for the State in their brief filed upon the re-hearing assert "that whatever rules and regulations can be passed and made by the legislature in the exercise of its power in relation to the business of a corporation can also be exercised in relation to the same business when carried on by natural persons, and that it would be strange, indeed, if it were not so." And again they say : "This and numerous other cases that might be cited settle the matter beyond controversy that there is no distinction between the rights of private persons and corporations, so far as they relate to the screening of coal, as required by the act in question, and that if the act is a legitimate exercise of the police power of the State as to the one it is same as to both."

This I regard as a proper concession and a fair statement as to the effect of the act under consideration. It was evidently the intention of the legislature to place all persons operating mines upon the same footing. The act is severable; it was not intended to discriminate between corporations and individuals; and such discrimination would not have been allowed by the constitution, if such had been the intention.

It being then conceded that individuals and corporations engaged in mining coal occupy precisely the same relation to the screening act above quoted, it follows that the police power confers no more right or power upon the legislature to interfere with the private contracts of such a corporation than it does to interfere with like contracts of an individual.

In the ninth clause of section 17, c. 14, Code, it is provided that the word "person" includes corporations, if not restricted by the context, and it has been held by the Supreme Court of the United States that they are persons, within the fourteenth amendment. See *Railroad Co.* v. *Beckwith,* 129 U. S. 26 (9 Sup. Ct. Rep. 207); *Santa Clara Co.* v. *Southern Pac. R. Co.,* 118 U. S. 394 (6 Sup. Ct. Rep. 1132); *Pembina etc., Co.* v. *Pennsylvania,* 125 U. S. 181 (8 Sup. Ct. Rep. 737).

If, then, a corporation chartered for the purpose of mining and shipping coal, as the plaintiff in error was, occupies the same attitude that a natural person does who is engaged in the same business, the question presented for our consideration is, what authority has the legislature, under police or any other power, to interfere with or control the private contracts of such corporation made with its employes for the production of merchantable coal from its mines?

We surely would search in vain for any precedent sanctioning such an unwarranted interference with private contracts. In the words of Sir George Jessel: "If there is one thing more than any other that public policy requires, it is that men of full age and competent understanding shall have the utmost liberty to contract, and that their contract, when entered into freely and voluntarily, shall be held sacred, and shall be enforced in courts of justice."

It is readily conceded that the police power is exercised where public protection, health and safety, and the rights of other individuals and corporations, are concerned; and Judge Cooley, in his valuable work on Constitutional Limitations, p. 575, says: "Perhaps the most striking illustrations of the principle here stated will be found among the judicial decisions, which have held that the rights insured to private corporations by their charters, and the manner of their exercise, are subject to such new regulations as from time to time may be made by the State with a view to public protection, health, and safety, and to properly guard the rights of other individuals and corporations Although these charters are to be regarded as contracts, and the rights assured by them are inviolable, it does not follow that these rights are at once, by force of the charter contract, removed from the sphere of State regulation, and that the charter implies an undertaking on the part of the State that in the same way in which their exercise is permissible at first, and under the regulations then existing, and those only, may the corporators continue to exercise their rights while the artificial existence continues. The obligation of the contract by no means extends so far, but, on the contrary, the rights and privileges which it confers

are only thereby placed upon the same footing with other legal rights and privileges of the citizen in respect to proper rules for their due regulation, protection, and enjoyment. The limit to the exercise of police power in these cases must be this: The regulations must have reference to the comfort, safety, or welfare of society. They must not be in conflict with any of the provisions of the charter, and they must not, under any pretense of regulation, take from the corporation any of the essential rights or privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise. The maxim, *sic utere tuo ut alienum non laedas,* is that which lies at the foundation of the power, and to whatever enactment affecting the management and business of private corporations it can not fairly be applied the power will not extend."

Can this statute be reconciled with section 10 of article III of the bill of rights of this State, which provides that "no person shall be deprived of life, liberty, or property without due process of law and the judgment of his peers," or with the first section of the fourteenth amendment to the constitution of the United States, which provides the same thing, in substance? In considering this question we must not lose sight of the fact that the coal, as it lies untouched in the mine, is the property of the operator, whether such operator be a single individual, or several who have combined their capital for the purpose of purchasing and operating the same as a corporation.

When the mine is opened for practical operation, as a matter of course the object of the operator, whether individual or corporate, is to obtain as much merchantable coal as possible from each foot of coal as it is mined. It is a matter of history connected with the mining of coal that in digging coal a considerable percentage of slack is necessarily produced, and that the most skillful miner produces the least slack, and this is something the court may take judicial cognizance of; and, as every bushel of coal that is brought from the mine in an unsalable condition in the shape of slack results in a sacrifice of just so much of the operator's coal-property, the operators of coal mines found

it necessary years ago to adopt the use of the screen, not only to separate the worthless slack from the clean, merchantable coal, but they also found it necessary to weigh the coal after it was screened as the true test of the value of each individual miner's services; otherwise, if the coal was weighed before it was screened as it came from the mine, the miner who sent out the bank car laden with the largest percentage of slack would receive the greater remuneration, because the slack would lie more compactly and weigh more than lump coal.

Can the screen, under these circumstances, be regarded as a fraud which calls for the interposition of the police power of the State ? Is it not rather the proper method of giving to the skilled miner what he is entitled to by reason of years of experience, instead of placing him on a par with the beginner, or really below the beginner, who is able to procure a small percentage of merchantable coal, and sends out the residue in the shape of slack. Ordinarily, where an employer contracts with his employe for the performance of his work in a certain manner, the production of an article of a certain quality—for instance, the quarrying of stone and dressing it to certain dimensions, or the mining of coal in lumps of sufficient size to pass over a screen, and pass as merchantable coal—he has a right to have the work performed in accordance with the contract, and not, to use a common expression, "purchase a pig in a poke," and pay the contract-price, without getting or without having the opportunity of applying the test, and ascertaining that he is receiving what he contracted for.

It is true the operator may, without violating the act under consideration, pass the coal over the screen after it is weighed and paid for ; but that only results in disclosing the large percentage of slack and small proportion of merchantable coal he has weighed and paid for, and the only redress he can obtain is in a reduction of wages, which will cause dissatisfaction among the miners, and will not restore to him the coal which has been destroyed by unskillful mining. It is also true that the miner can not either expect or reasonably demand as much per bushel for coal which is weighed before it is screened as he has heretofore received for screened coal.

What, then, are the inevitable results of the law under consideration? It depresses the wages of the miner; it takes bread from the family of the skilled miner, and gives it to the family of the careless and unskilled one; and it causes the product of the mine to be received in such a condition that a large percentage thereof is worthless to him, and to that extent the coal property for which he has paid his money is taken from him without compensation. When this act is enforced, there is no longer any incentive to the skillful miner to send out, as the product of his labor, the highest percentage of merchantable coal; and in consequence the product of the mine in the shape of merchatable coal is small, while the waste in the substance of the mine is great.

The opinion which has been handed down in these cases places the constitutional validity of the acts, under which said indictments were found upon the general police powers of the State, and with this position I can not concur, for the following reasons:

*First,* it must be conceded that an individual or a corporation becoming the owner of coal lands, and engaging in mining and disposing of coal, can not be regarded in any other light than as being engaged in a private enterprise. In the case of *Salt Co.* v. *Brown,* 7 W. Va. 191, this Court held that a corporation chartered for the purpose of mining coal and manufacturing salt was not organized for a public use, and for that reason could not exercise the right of eminent domain.

The opinion handed down in speaking of the peculiar and extraordinary privileges conferred upon corporations, cites section 7, p. 994, Code, which provides that, "in case a coal-mine has but one opening, and the owner thereof does not own suitable surface ground for another opening, as required by the next preceding section, he may select and appropriate any adjoining land for that purpose, and for approach thereto, and he shall be governed in his proceeding in appropriating such land by the laws in force providing for the appropriation of private property by corporations, and such appropriation may be made whether he is a corporator or not; but no land shall be appropriated un-

der the provisions of this act, until the court is satisfied that suitable premises can not be obtained on reasonable terms;" showing that this privilege is not conferred on corporations alone, but upon individuals engaged in the business of mining; and the only ground upon which this act could possibly be sustained is that the health and safety of the miners demand it, and it might thereby be brought within the purview of the police power.

In the case of *Varner* v. *Martin*, 21 W. Va., 534, this Court held that, "under our constitution, private property can not be taking with or without compensation, for private use ;". also that, "under our constitution private property can be taken only for public use, and then only upon just compensation being paid or secured to be paid." And in the case of *Railroad Co.* v. *Benwood Iron Works*, 31 W. Va. 710 (8 S. E. Rep. 453) this Court held that, "where a railroad company sought to condemn land, over which to build a switch, branch road or lateral work to reach a private manufactory (a steel mill) for the purpose of transporting freight to and from said steel mill over petitioner's road, the use to which the land was to be subjected was a private, not a public, use."

Now, when we look to the charter of the Peel Splint Coal Company to see what it was authorized to do, we find that it was chartered for the purpose of leasing or buying and owning coal-lands and coke-plants; mining, shipping and selling coal, manufacturing, shipping and selling coke, buying and selling general merchandise; owning chartering and operating steam boats, barges, flatboats and other water-craft for the purpose of transporting the goods and products of said corporation and others, and acquiring and holding such property, real and personal, and doing such acts, as said corporation might lawfully, as incidental or necessary to the transaction of the business aforesaid, hold and do—all of which a natural person or individual could lawfully do without a charter, and without being limited, as a corporation is, by statute to holding ten thousand acres of real estate. There is nothing in this charter which would characterize said company as anything other than a private corporation.

The question as to whether the legislature has a legal right to provide how and when coal shall be weighed appears from the authorities to turn upon and be controlled by the question as to whether the business is affected with a public interest. So in the case of *Budd* v. *New York,* 143 U. S. 539 (12 Sup. Ct. Rep. 468). Justice BLATCHFORD says: "In *State* v. *Gas Co.,* 34 Ohio St. 572, 582, (in 1878) *Munn* v. *Illinois,* 94 U. S. 113, was cited with approval, as holding that, where the owner of property devotes it to a use in which the public have an interest, he, in effect, grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public for the common good, so long as he maintains the use; and the court added that in *Munn* v. *Illinois* the principle was applied to warehousemen engaged in receiving and storing grain, and it was held that their rates of charges were subject to legislative regulation, and the principle applied with greater force to corporations when they were invested with franchises to be exercised to subserve the public interest."

As we have seen, in this State, in the case of *Salt Co.* v. *Brown,* it was held that the mining of coal was not of such public utility as to entitle the company to exercise the right of eminent domain; and in the case of *Railroad Co.* v. *Benwood Iron Works, supra,* it was held that a private corporation engaged in the manufacture of steel was not of such public utility as to enable it to condemn land for a switch leading to the Pan Handle Railroad, for the purpose of transporting the product of the mill.

If such corporations, then, are not affected with sufficient public interest to enable them to exercise this right, should they not be regarded as private corporations, and not subject to police control, further than the health and safety of the operators are concerned, and further than an individual engaged in the same business would or could be controlled?

In the case of *Sawyer* v. *Davis,* 136 Mass. 239, the supreme judicial court of Massachusetts said that "nothing is better established than the power of the legislature to make what are called police regulations, declaring in what

manner property shall be used and enjoyed and business carried on with a view to the good order and benefit of the community, even though they may interfere to some extent with the full enjoyment of private property, and although no compensation is given to a person so inconvenienced;" and just here I may ask, with propriety, how will the community in any manner be affected, whether the coal of this company is weighed before or after it is screened, and how will the public in general be affected thereby?

In the case of *Ward* v. *Farwell*, 97 Ill. 608, the court in its opinion says: "Private corporations created for business purposes are artificial beings, clothed with certain rights and privileges, and are permitted to own and acquire property for certain purposes and to a limited extent; and when so created they are subject to the same legislative control that natural persons are under like circumstances. With certain constitutional limitations, the rights of all persons, whether natural or artificial, are subject to such legislative control as the legislature may deem necessary for the general welfare, and it is a fundamental error to suppose there is any difference in this respect between the rights of natural and artificial persons. They both stand precisely on the same footing."

Tiedman, in his valuable work on the Limitations of Police Powers, in speaking of the police regulation of corporations in general, on page 584, § 191, says: "But the corporation is no more subject to arbitrary regulations than is the individual. In order that the regulation of a corporation may be within the constitutional limitations of police power, it must have reference to the welfare of society, by the prevention or control of those actions which are calculated to inflict injury upon the public or the individual. As in all other cases of the exercise of the police power, the police regulations of corporations must be confined to the enforcement of the maxim, *sic utere tuo ut alienum non lœdas*, subject to the observance of which every corporate charter must be supposed to have been granted. Any attempt, under the guise of police regulations, to repeal or amend the charter, or to abridge any of the corporate rights and pri-

vileges, would of course, be unconstitutional and void," (citing numerous cases). "The property of the corporation can not be confiscated under the pretense of being a police regulation, without payment of compensation."

And at this point the question suggests itself, what more complete confiscation of the operator's property could possibly be enforced than to have a large percentage of his coal mined and put out in a condition that would be utterly worthless to him, and in addition to that to be compelled to pay the miner for his labor in producing it in that condition?

To uphold, as constitutional, legislation which interferes with the private contracts of the operator with the miner, and prescribes that coal shall be weighed and paid for before it is screened or any opportunity is afforded to determine its quality and value, would appear to me to be on a par with legislation which would compel the owner of a stone or marble quarry, who had contracted with his employes to pay them for dressed stone of certain dimensions, to measure the blocks in the rough, as they came from the quarry, and pay, not only for the dressed stone, but for the spalls and waste that accrued in squaring the same in accordance with the contract, and would characterize as constitutional an act which would provide that the landowner who employes a sawmill man to go among his timber, and according to the common expression take it from the stump and convert it into merchantable boards and lumber, to measure and pay for the same as it came from the saw, including in the measurement, slabs, culls, sawdust, and particles torn away by the action of the saw, and would sanction a law which would compel a diamond to be paid for in the rough, before its qualities had been tested and developed by submitting it to the skillful hands of the lapidary.

I fail to perceive in what manner the public is interested in the private contract made between the coal-operator and his employes, as to the time when such employe shall have the product of his labor weighed and paid for. The labor of the employe is his own property, and he has a perfect right to fix a price upon it, let it be high or low, and the public has no right to say, "Why do you so?" Neither is

the public welfare in any manner affected by the terms of the contract, any more than it is in that of the man who works by the day on the farm.

The seventh section of the act providing for weighing coal before it is screened excludes from its operation any corporation, company, or person owning or operating a coal mine in which less than ten miners are employed, which results in this : that an operator only employing nine need not weigh the coal before it is screened, but one employing twelve must. Can any one say why the operator should be allowed to weigh the coal after it is screened for the nine, and that he must weigh it previously for the twelve? Is not the danger of fraud as great to the individual miner in the one instance as the other? and is not one miner as much entitled to the benefit of the law (if it be beneficial) as another? And again, is there any good reason why the small operator should be allowed to obtain from his mine merchantable coal by using the screen before it is weighed, and the large operator be denied the privilege of thus testing the services of his employes, and obtaining merchantable coal for the wages he pays them? and why is it that the police power of the State should be invoked for the protection of the twelve while the nine are left to work their way with fear and trembling, and protect themselves from the alleged iniquities of the screen?

The case of *Godcharles* v. *Wigeman*, 113 Pa. St. 431 (6 Atl. Rep. 354) holds that "the first four sections of the 'Store Order Act' of June 29, 1881, which attempts to prevent persons who are *sui juris* from making their own contracts, are unconstitutional and void," and the court in its opinion says: "The act is an infringement alike of the right of the employer and the employe; more than this, it is an insulting attempt to put the laborer under a legislative tutelage, which is not only degrading, but subversive of his rights as a citizen of the United States. He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing is an infringement of his constitutional priviliges, and consequently vicious and void."

So, also, In Re Jacobs, 98 N. Y. 98, it is held that "while, generally, it is for the legislature to determine what laws are required to secure and protect public health, comfort, and safety under the guise of police regulations, it may not arbitrarily infringe upon personal or property rights, and its determination as to what is a proper exercise of the power is not final or conclusive, but is subject to the scrutiny of the courts."

In the case of Watertown v. Mayo, 109 Mass. 315, 319, Colt, J., says: "The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance, and, when it appears that such is not the real object and purpose of the regulation, courts will interfere to protect the rights of the citizen."

In the Slaughterhouse Cases, 16 Wall 36, 87, Field, J., says: "All sorts of restrictions and burdens are imposed under the police power, and, when these are not in conflict with any constitutional prohibitions or fundamental principles, they can not be successfully assailed in a judicial tribunal; but, under the pretense of prescribing a police regulation, the state can not be permitted to encroach upon any of the just rights of the citizen which the constitution intended to secure against abridgement."

Again, in the case of People v. Gillson, 109 N. Y. 389 (17 N. E. Rep. 343) the court held that "while it is for the legislature generally to determine what laws and regulations are needed to protect the public health and serve the public comfort and safety, and the exercise of its discretion in this respect is not the subject of judicial review, yet a statute, to be upheld as an exercise of the police power, must have some relation to these ends. The rights of property may not be invaded under the guise of a police regulation for the protection of health, when it is manifest such is not the object of the regulation."

In this immediate connection I may ask how or in what manner could the public health, comfort or safety be in any manner concerned in the enforcement of a statute which provides that coal, as it comes from the mine, shall be weighed in the car in which it is removed from the mine

before it is screened, and shall be paid for according to the weight so ascertained, at such price per ton as may be agreed on by such owner or operator and the miners who mine the same? Instead of promoting the public safety and welfare, does not this act rather have a tendency to promote dissatisfaction and discord between the operator and miners who were prosecuting their work under their contract to receive pay for mining the coal which was weighed after it was screened?

In the State of Illinois an act was passed requiring the operator of mines to cause to be furnished and placed upon the railroad track adjacent to the coal mine a track scale of standard measure, upon which to weigh the coal hoisted from the mine, and at the time the act took effect, and for a long time prior thereto, the corporation owning the coal mine had a contract with all men employed to mine coal in that mine to receive, as the wages for their labor, forty cents per box for the coal mined therefrom, and said miners were satisfied to work under said contract. Upon an indictment for failing to provide such track scales and weigh the coal as in said act provided, the Supreme Court of Illinois, in the case of *Millett* v. *People*, 117 Ill. 295 (7 N. E. Rep. 631) held (p't 5 of syllabus :)

"It is not competent for the legislature, under the constitution, to single out owners and operators of coal mines, and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make. Such legislation can not be sustained as an exercise of the police power." And the same thing was held by this Court in the case of *State* v. *Goodwill*, 33 W. Va. 179 (10 S. E. Rep. 285) and in the case of *Frorer* v. *People*, 31 N. E. Rep. 395 (decided by the Supreme Court of Illinois, March 26, 1892) which was an action of debt under the act approved May 28, 1891, entitled "An act to provide for the payment of wages in lawful money, and to prohibit the truck system, and to prevent deduction from wages, except for lawful money actually advanced."

The court in its opinion quotes with approval the case of

*Com.* v. *Perry,* from the Supreme Court of Massachusetts, reported in 28 N. E. Rep. 1126, saying : "The defendant was indicted under a statute in Massachusetts providing that no employer shall impose a fine upon, or withhold wages or any part of the wages of an employer at weaving for imperfections that may arise during the process of weaving ;" and the court held the statute unconstitutional, and in doing so said :

"There are certain fundamental rights of every citizen which are recognized in the organic law of all our free American States. A statute which violates any of these rights is unconstitutional and void, even though the enactment of it is not expressly forbidden. The right to acquire, possess, and protect property includes the right to make reasonable contracts which shall be under the protection of the law. The manufacturer of cloth is an important industry, essential to the welfare of the community. There is no reason—indeed, the statute before us recognizes it—why men should not be permitted to engage in it as a legitimate business into which anybody may freely enter. The right to employ weavers, and to make proper contracts with them, is therefore protected by our constitution ; and a statute which forbids the making of such contracts, or attempts to nullify them or impair the obligation of them, violates fundamental principles of right, which are expressly recognized by our constitution."

Why, I ask, may not all this be said with equal propriety with reference to contracts made between employer and employe engaged in the coal industry in our own State ?

The Court further on in its opinion, in the case of *Frorer* v. *People, supra,* says : "But it is contended the enactment before us is sustained by the principles announced in *Munn* v. *People,* 69 Ill. 80. There is, in our opinion, no analogy between that case and the present. In the first place, there the subject-matter of the act was local and exceptional in its nature, and the law in question operated alike upon all effected by like conditions. In the second place, the business of warehousing was held to be affected by a public use, and assimilated to the business of carriers, innkeepers, millers, and others of like kind, and therefore subject to

regulations for the public welfare." * * "And in the third place, the statute there affected only the business of warehousing—that wherein the necessity of transportation from west to east left the shipper no discretion, but compelled him, whether he would or not, to patronize the warehouse. It did not assume to regulate or restrict the warehousemen in contracting with his laborers, or his laborers in contracting with him."

And again, the court says: "But the police power is limited to enactments having reference to the comfort, the safety, or the welfare of society, and under guise of it a person can not be deprived of a constitutional right;" citing *Millett* v. *People, supra.* "It would seem quite clear that the enactment before us "speaking of the truck-store bill" has no reference to the comfort, the safety, or the welfare of society, for it applies as well to a case where a poor man in want of tools, clothing, and food, without money and without credit, but able and desirous to labor to obtain tools, clothing and food, applies to the operator of a mine or manufactory who is able to, and but for the prohibition of this law willing to, exchange them on fair terms for the labor of him who needs them, as to cases where there is the strongest probability that the employer will in such exchange overreach and defraud the employe. * * * The act does not attempt to prevent extortion and fraud by the operator of the mine or manufactory otherwise than by the heroic treatment of withdrawing the power of contract. It proceeds upon the principle that because liberty may be abused, the liberty itself should be withdrawn—a principle by the extension of which all liberty in the acquisition of property may be withdrawn from every citizen."

Indictment No. 4, under consideration in this case, was found under section 1, c. 76, Acts 1891, which provides that "it shall be unlawful for any corporation, company, firm, or person engaged in any trade or business, either directly or indirectly, to issue, sell, give, or deliver to any person employed by such corporation, company, firm, or person, in payment of wages due such laborer, or as advances for labor not due, any scrip, token, draft, check, or

other evidence of indebtedness payable or redeemable otherwise than in lawful money," 'etc.

Now, while this act seems to be aimed only at corporations and persons engaged in trade or business, it would include in its operation a person engaged in farming, which constitutes one of the great industries of the country, on which many others depend, and would forbid the farmer from giving his farm hand an order to the village store for merchandise in payment for his labor; and it loses sight of the fact that a large portion of every community is composed of those who have retired from business, or who never engaged in any trade or business. To one of the latter class, who are not engaged in any of the active industries of the country, the act does not apply. He may employ a man to black his boots or groom his horse or spade his garden, but surely he could not be regarded as being engaged in the business of blacking boots, grooming horses, or spading gardens, and, if he has not the money in his pocket, he may with impunity give his servant an order to the store in payment for his servides because he is engaged in no trade or business.

It therefore appears that this act singles out those who are engaged in trade or business to the exclusion of those not so engaged, and does the very thing which this court in the case of *State* v. *Goodwill*, has said can not be done without a violation of the constitution.

In the case of *Hancock* v. *Yaden*, 121 Ind. 366 (23 N. E. Rep. 253) a distinction appears to be drawn between a contract made by the miner before the services are performed and a contract made subsequent thereto, and in that case it was held that the contract is void, in so far as it assumes, by an antecedent agreement, the right to receive wages in lawful money of the United States, being in violation of the statute ; and, further, that the legislature has such authority over the right to contract as to prohibit contracts from being made in advance, waiving the right to payment in lawful medium of payment ; and the court seems to concede in its opinion that such an agreement may be made after the services have been rendered.

The statute we are considering, however, makes it un-

lawful for any corporation, firm, or person engaged in any trade or business to issue, sell, give or deliver to any person employed by such corporation, company, firm, or person, in payment of wages due such laborer, or as advances for labor not due, any scrip, token, draft, check, or other evidence of indebtedness payable or redeemable otherwise than in lawful money. This statute would prevent the mine operator from giving to the miner who came to him empty handed, and wanted to labor, an order to his store for meat and flour to live on until he earned something ; although accepting said contract would amount to no antecedent agreement to receive all of his wages in goods, yet it might be considered an advance for labor not due, and would thus fall within the inhibition of this statute, and results in this : that a mine operator can not lawfully advance wages in the shape of merchandise to the miner before he has earned them, nor can he pay him in anything but money after the services have been performed, however willing the miner might be to accept it.

For these reasons I am of opinion that the act known as the "Screening Law" can not be sustained under the general police power ; neither can the other act be regarded as constitutional, for the reasons herein stated ; and, under the rulings of this Court in the case of *State* v. *Goodwill, supra,* in my opinion, the judgments complained of should be reversed.

BRANNON, JUDGE (*dissenting.*)

When, at a former term, I concurred in the decision then made of these two cases, I had very great doubt ; but I resolved that doubt in favor of the validity of the act. Re-argument and a patient reconsideration have intensified that doubt into a decided opinion that the "Screening Act" and the "Scrip Act" are both unconstitutional. I cherish the highest respect for the legislature, and, if these acts were meant for and would benefit miners, I will say that no one will go further and more freely than I in the defence of their interests and rights ; but I must do so in harmony with the constitution, that impartial arbiter of the rights of all men in free republican government. It is the highest

and most sacred of all the functions of the judiciary to uphold the constitution without fear, favor, or affection.

Federal and State constitutions together declare "that all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they can not by any compact deprive or divest their posterity, namely, the enjoyment of life and liberty, and of pursuing and obtaining happiness and safety." * * "No person shall be deprived of life, liberty, or property without due process of law." * * "Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," nor "abridge the privileges or immunities of citizens of the United States."

The word "liberty," as here used, does not mean simply exemption from bodily imprisonment, but liberty and freedom to engage in lawful business, and to make lawful contracts therein, to the ends of earning a livelihood for self and family, and of acquiring and enjoying property, and of obtaining happiness. The right to contract and be contracted with is indispensable to these indispensable objects. Elsewhere this great right is recognized in the constitutions by the provision that contracts made in its exercise shall not be impaired. It is a privilege essential to earn bread and secure happiness. Vain would be the pursuit of happiness if the right of contract necessary to secure the bread of life, and raiment and home be taken away. Scarcely any of the great cardinal rights are more universally recognized and vindicated under our system, indeed, under all civilized governments, than this right of contract. A man must have the right to exercise his skill and talents, and dispose of and use his labor and property, in lawful pursuits as to him shall seem proper. The property right may be violated by prohibiting its full use to the owner, as effectually as by taking it from him, his ownership being thus damaged.

I shall not elaborate my views, as other judges fully discuss the subject. My conclusion is that both acts invade the essential rights of business, contract, and property, as

against both employer and employe, forbidding contracts and the use of property, and the disposal of skill and labor, which, but for the acts, would be perfectly lawful, and that the acts are not within the police power.

The "Screening Act" discriminates against the business of coal mining only, and is class legislation. Farming and brickmaking, for instance, are private occupations, which, no matter what their magnitude, are not so in touch with the public interest as to place them under the police power and legislative control. Neither is coal mining. If, upon the suggestion of a supposed or real evil, always incident to the transaction of all business, the legislature can restrict lawful contracts in private business, government becomes, not simply paternal, but oppressive and tyrannical.

The "Scrip Act" would prevent the farmer, brickmaker, or coal operator from giving to his hands for wages an order to any one for sugar, coffee, flour, or meat—a great reversal in the right of contract as used time out of mind. This act was not meant to prevent the vitiation of the circulating currency of the country, and can not be supported on that theory.

I concurred in the decisions in *State* v. *Coke Co.* 33 W. Va. 188 (10 S. E. Rep. 288) *State* v. *Goodwill*, 33 W. Va. 179 (10 S. E. Rep. 285); *State* v. *Gilman*, 33 W. Va. 146 (10 S. E. Rep. 283.) A review of those cases brings me to the same opinion, and I do not see how we can sustain these statutes without abandonment of the soul and spirit of those decisions. Those cases, with other authorities, upon this rehearing have conducted me to the opinion just indicated. *Godcharles* v. *Wigeman*, 113 Pa. St. 431 (6 Atl. Rep. 354); *Frorer* v. *People*, Ill. Sup. filed March, 1892 (31 N. E. Rep. 395); *Com.* u. *Perry*, Mass.; filed Dec., 1891 (28 N. E. Rep. 1126); *In re Jacobs*, 98 N. Y. 98; *People* v. *Gillson*, 109 N. Y. 389 (17 N. E. Rep. 343); *Millett* v. *People*, 117 Ill. 294 (7 N. E. Rep. 631); *Ex parte Kubach*, 85 Cal. 274 (24 Pac. Rep. 737); Cooley, Const. Lim. (5th Ed.) 727, 739.

The adverse opinions in *Munn* v. *Illinois* 94 U. S. 113, and *Budd* v. *New York*, 143 U. S. 517 (12 Sup. Ct. Rep. 468) are able and exhaustive of the subject. I do not think the decisions in those cases govern these, because there the

statutes could more readily be ranked under the police power, since they regulated between the operators of grain elevators and the general and unlimited public, fixing charges for the benefit of the public; whereas, these acts are not made for the public at large, but simply prohibit certain contracts between employers and employes.

AFFIRMED BY A DIVIDED COURT.

---

NOTE, by LUCAS, P.—In the opinion it is not intended to assert that counsel admitted that the indictments Nos. 1 and 2 presented moot questions, but that they admitted facts which the court adjudged to constitute a moot proceeding. The defendant can not be permitted to frame the indictment against himself in a criminal proceeding.